DECISION TRAVEL
On or about July 24, 1995 the respondent/defendant (respondent or Muhammed) killed his father, was arrested and sent to the Adult Correctional Institutions (ACI). In January of 1995 the respondent was ordered by a justice of this court to be evaluated to determine his competency to stand trial. At that time, John deCarle, M.D. concluded that Muhammed was incompetent to stand trial resulting in his transfer to the Eleanor Slater Hospital's Forensic Unit (ESH) for further evaluation. It should be noted that this was Muhammed's second admission to a psychiatric hospital. In June of 1994, he admitted himself to the Grady Memorial Hospital (Grady) in Atlanta, Georgia because, among other things, he was "hearing voices." He was medicated and became "less anxious." At Grady the respondent was diagnosed as having "some paranoid ideations and delusions concerning his girlfriend." Refusing to continue medication and against medical advice, Muhammed left Grady after eight days and less than a year later he murdered his father.
On April 14, 1995, based upon a report of Dr. Dennis Barton of ESH, it was determined that Muhammed was competent to stand trial resulting in his return to the ACI by order of this court, where he resided until October 25, 1995. On that date, at the request of the Attorney General, Muhammed was court ordered to return to ESH for "psychiatric evaluation." At this time, Dr. Barry Wall, Director of Forensic Services at the Department of Mental Health, Retardation and Hospitals (MHRH) determined that although the respondent met the diagnostic criteria for a mental disorder he was competent to stand trial. Thus, Muhammed was returned to the ACI on January 11, 1996.
On the 14th of May 1996, Muhammed entered a plea of nolo to the amended charge of murder in the second degree and was sentenced to serve 22 years at the ACI.
On June 23, 1998, at the instigation of Dr. Martin Bauermeister (ACI psychiatrist), Muhammed was transferred to ESH for "Specialized mental health care and psychiatric in-patient services." According to Dr. Bauermeister, respondent began to refuse all psychiatric medication and after seven months started to indicate symptoms of relapse. It was Dr. Bauermeister's opinion that by June of 1998, Muhammed had become "quite psychotic." Consequently, Muhammed was returned to ESH on June 23, 1998 where he remained until October 5, 1998. During that time, the Superior Court granted ESH substituted consent to treat the respondent with psychiatric medication eventuating in improvement in Muhammed's mental health and his return to the ACI.
Muhammed once again, on March 27, 1999, was transferred from the ACI to ESH ostensibly according to Dr. Bauermeister for refusal of all medication for six months resulting in his decompensation. It was Dr. Bauermeister's conclusion that once again Muhammed required inpatient treatment. On June 15, 1999, the Director of MHRH filed a petition to return Muhammed to the ACI again. In response, Muhammed filed an objection to the transfer dated August 5, 1999.
Subsequent to the respondent's objection, an issue arose as to whether he was entitled to a hearing prior to transfer under 40.1-5.3-9 of the R.I.G.L. Understandably the matter was delayed. Resolution of that issue was achieved by Justice Savage who, on June 21, 2000, rendered a decision holding that 40.1-5.3-6 through 9 of the R.I.G.L. entitles inmates at the ESH to a hearing before they can be returned to the ACI.
In consequence of Justice Savage's decision, this Court assigned this case for an evidentiary hearing on the issue. Due to court constraints and commitment of counsel in other matters, the hearing proceeded sporadically commencing April 9, 2001 and concluding on January 18, 2002.
At this juncture it should be noted that it is not disputed that Muhammed is mentally ill. It is agreed that he suffers an illness known as Schizo-affective disorder. This condition is a major mental illness, biologically based incurable, but treatable.
 WITNESSES
The hearing produced four witnesses: Brandon Krupp, M.D., Chief of Psychiatric Services, ESH; G. Mustara Surti, the attending psychiatrist at the Forensic Unit at ESH. Both witnesses testified for the petitioner. The respondent elicited testimony from Alan Feinstein, M.A., Supervising Clinical Psychiatrist, Director of Mental Health Services, Rhode Island Department of Corrections (DOC), and Gregory Dill, M. D., attending psychiatrist, Mobile Treatment Team, Kent County Community Health Center, Warwick, Rhode Island.
Dr. Krupp's testimony dealt essentially with the nomenclature of the ESH, its policies, procedures and statutory mission. He testified how for several months prior to this hearing, administrators from ESH and DOC had met in order to develop a policy which allows the ACI to administer psychiatric medications to inmates involuntarily. Under this policy, prisoners who are deemed incompetent will be medicated against their will. Dr. Krupp stated further that this exercise will only occur as a last resort and only after court authorization. Although Dr. Krupp did not personally treat the respondent, from his medical records, however, it is apparent that his medications[1] help him think clearer. One of the purposes of this psychiatric patient's treatment is to assist him in understanding his illness and to ensure compliance with the regimen of medication in order to reduce the risk of relapse. It is obvious from Dr. Krupp's testimony it is his opinion that Muhammed's transfer to the ACI under the new policy adopted by that institution would not be deleterious to him.
G. Mustafa Surti, M. D., witness for the petitioner, testified that he is the attending psychiatrist at ESH Forensic Unit and has treated the respondent for six months and it is his diagnosis that he suffers from Schizo-affective disorder[2] which is incurable but treatable via appropriate medication. Dr. Surti stated that Muhammed's participation in therapy groups (cooking, socialization, games) have been, in addition to his medication, beneficial to him to the extent that he has been assigned to do some menial jobs such as cleaning the kitchen and similar tasks. It was also Dr. Surti's testimonial evidence that in the six months he has treated the respondent, there have been no symptoms of psychosis, depression or manic symptoms, nor are his sleep patterns inappropriate. He also stated that there have been no aggressive episodes with hospital staff. It was Dr. Surti's professional opinion that Muhammed is sufficiently recovered to return to the ACI since there have been no active symptoms of hallucinations, delusions or moods which would require impatient hospital level care. From Dr. Surti's testimony, this Court concludes that he is satisfied that the ACI, under the recently established policies can monitor Muhammed's medications and its possible side effects. Dr. Surti also stated that in a discussion with Dr. Bauermeister and Alan Feinstein that they expressed no objection to Muhammed's return to the ACI.[3]
The respondent's first witness was Alan Feinstein, M.A., who is the Supervising Clinical Psychologist and Director of Mental Health Services at DOC. His duties in general are to supervise a staff of psychologists and social workers and monitor the dispensing of mental health treatment for the incarcerated. Mr. Feinstein described the expansion of mental health services at the ACI by way of a full time professional staff, improved medication monitoring and quicker access to mental health services by the inmates. Feinstein also outlined the newly adopted policy for the involuntary medication of inmates who refuse to comply with the regimen. Mr. Feinstein went on to summarize the procedures Muhammed would encounter if returned to the ACI. Muhammed would be initially placed at the Intake Center for psychiatric observation for an indefinite period. In the event, after assessment, Muhammed were placed in general population, the staff at that particular facility would be informed of his prior mental health history. Muhammed's intake of his medications would be closely scrutinized. If medication is refused by the respondent, the staff would at first discuss the situation with him and if he persists in refusal, steps would be taken to implement the policy of involuntary medication.
The most interesting and compelling part of Mr. Feinstein's testimony is as follows:
 Q by Mr. Cosper: So the question was, in the entire prison system, is there anything like a therapeutic milieu for inmates with mental illness and mental disorders?
 A. Mr. Feinstein: I would say no, we have no specialized treatment program or facility units designed to meet the needs of those folks who suffer from serious mental illness. The individuals who do are by and large housed in the general population in the ACI.[4]
The import of Mr. Feinstein's response is clear, i.e., the ACI does not have the environment or setting to provide the necessary therapy for those inmates who suffer from serious mental illness.
Gregory Dill, M.D., testifying for the respondent, was the final witness in this action, Dr. Dill is a board certified Psychiatrist licensed in Rhode Island He is presently Attending Psychiatrist for the Mobile Treatment Team at Kent County Hospital. Dr. Dill served his internship and residency at the University of Colorado in Denver, 1989, through 1993. While there he spent one year at the state mental hospital where he performed forensic evaluations. Dr. Dill came to Rhode Island in 1994 and joined the psychiatric staff at St. Joseph's Hospital in Providence. He is presently employed at the Kent County Community Health Center.
The respondent became known to Dr. Dill in 1998 while Muhammed was on his third admission to ESH Forensic Unit. Muhammed was evaluated by Dr. Dill at the request of the office of Rhode Island's Mental Health Advocate. It was Dr. Dill's conclusion at that time that Muhammed's acute symptoms were stabilized, but that insight into his illness was limited. Nevertheless, Dr. Dill informed the Mental Health Advocate that Muhammed could possibly be returned to the ACI without relapse and that a return would not be clearly inappropriate. The respondent was thereafter returned to the ACI.
Dr. Dill was again asked to evaluate Muhammed in March of 2001, again at the request of the Mental Health Advocate. Commensurate with that request, Dr. Dill reviewed Muhammed's medical records from 1994 when the respondent admitted himself to the Grady Memorial Hospital in Georgia to the present. He also interviewed Muhammed twice, March 20, 2001 and December 11, 2001. Total interview time of Muhammed approximated one hour and forty-five minutes. Dr. Dill stated that Muhammed's mental health records at the ACI at the time of his admission to ESH in March of 1999 indicated that he was violent, disorganized, irrational and smearing feces. Dr. Dill did, however, state that Muhammed did not display any of those acute symptoms when he interviewed him in March of 2001.
Dr. Dill agreed with Dr. Surti that Muhammed is afflicted with a Schizo-affective disorder that is not curable and must be treated for life. He stated that although he has seen patients go into remission that occurrence is exceptional.
It was Dr. Dill's opinion that Muhammed should not be transferred to the ACI since it would present a toxic environment for him.
 FINDINGS
This Court has reviewed its own notes of the testimony, memoranda provided by counsel, all exhibits, particularly Exhibits 8A, 8B and 8C of the respondent and makes the following findings of fact:
 1. That the respondent, Rahsaan Muhammed is mentally ill.
 2. That his illness known as Schizo-affective disorder is a major mental illness, biologically based, incurable but treatable through medication and proper therapy.
 3. That when symptomatic, Mr. Muhammed is subject to disorganized, irrational thinking and violence.
 4. That this condition of Mr. Muhammed existed at least as far back as 1994.
 5. That in July of 1995, Mr. Muhammed murdered his father in the State of Rhode Island resulting in a jail sentence of 22 years at the ACI.
 6. That the respondent at this time is housed at the ESH Forensic Unit.
 7. That, at present, Mr. Muhammed's mental condition appears to be stabilized.
 8. That since January 27, 1995 through March 29, 1999, Mr. Muhammed has had four admissions to the ESH Forensic Unit either for competency evaluation and restoration or specialized mental health treatment.
 9. That, at present, Mr. Muhammed is still mentally ill and in need of specialized mental health care and psychiatric inpatient services which cannot be provided in a correctional facility.
 10. That Mr. Muhammed has not sufficiently recovered his mental health to be transferred to the ACI.
 CONCLUSION
Based on the evidence presented, this Court concludes that the petitioner has failed in her proof and there remains clear and convincing evidence that Mr. Muhammed is mentally ill and in need of mental health services which cannot be provided at a correctional facility, in this case, the ACI.[5]
Petition denied.
[1] Haldol, both oral and by injection; Senokot "s", Cogentin. See Exhibits 8A, 8B and 8C.
[2] It appears from the evidence that Muhammed was diagnosed originally with being Schizophrenic which is a thought disorder. Schizo-affective disorder is a thought disorder in addition to a mood disorder.
[3] Mr. Feinstein refutes this saying it would be more accurate to say that he has no opinion.
[4] Taken verbatim from the court stenographer's (Kathleen Murray) record of the proceedings.
[5] This clear and convincing standard was established by Ms. Justice Savage in three consolidated cases: In Re: Kevin Clark, M.P. 99-1601;In re: Rahsann Muhammed, M.P. 99-1602; In Re: Pheakiny Nem, M.P. 99-4546 (R.I. Super. Ct. 2000).